# In the United States Court of Federal Claims

No. 24-1641C
Filed: March 11, 2025[*]
NOT FOR PUBLICATION

| | |
|---|---|
| **BLUE WATER THINKING, LLC,** | |
| *Plaintiff*, | |
| v. | |
| **UNITED STATES,** | |
| *Defendant,* | |
| and | |
| **GOLDPATH COMMUNICATIONS JV, LLC,** | |
| *Defendant-Intervenor.* | |

*Aron Caraway Beezley*, *Patrick R. Quigley*, Bradley Arant Boult Cummings LLP, Washington, DC, for the plaintiff.

*Vijaya Surampudi*, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

*Henry Todd Whay*, *Ian A. Cronogue*, Baker, Cronogue, Tolle & Werfel, LLP, Mclean, VA, for the defendant-intervenor.

## MEMORANDUM OPINION

**HERTLING, Judge**

In this post-award bid protest, Blue Water Thinking, LLC ("BWT") challenges the issuance by the U.S. Department of Veterans Affairs ("VA") of Request for Quotation No. 36C10G22R0005 ("RFQ") for Program Support Integration ("PSI"). BWT claims that the VA's

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on March 3, 2025, and the parties were directed to propose redactions of confidential or proprietary information by March 12, 2025. The parties proposed a single redaction. (ECF 45.) The proposed redaction is accepted and denoted by [* * *].

award decision to the intervenor, GoldPath Communications JV, LLC ("GoldPath"), was "arbitrary, capricious, an abuse of discretion, and contrary to law."  (ECF 27 at 26.)

BWT is a Virginia limited liability company and a Service-Disabled Veteran-Owned Small Business ("SDVOSB").  (ECF 26 at 2.)  Since 2018, BWT has developed a "support team for VA" that includes "150+ dedicated VA-badged personnel" that can respond to "dynamic program requirements."  (AR 1011.)  These professionals include "subject matter experts, technologists, virtual care practitioners, marketing, communications and outreach campaign/media specialists, instructional design/training consultants, and specialists in integrated program management and project support."  (*Id*.)

The Office of Connected Care ("OCC") of the VA's Veterans Health Administration ("VHA") focuses on improving health care by engaging veterans through technology, as in telehealth.  The OCC historically provided these services through a single contractor but decided in 2022 to obtain the services through "three distinct and separate contracts to leverage innovation and flexibility to meet mission needs."  (AR 226.)

BWT challenges the award of one of the three contracts, the PSI contract, which requires the contractor to provide: (1) "Program Management and Program Integration Support"; (2) "Project, Release, and Implementation Management Support"; (3) "Communications Support"; and (4) "Training Development, Delivery, and Implementation Support."  (AR 470-71.)  In September 2022, the VA issued the RFP for the PSI contract.  The RFP seeks a single award, firm-fixed-price, indefinite delivery, indefinite quantity ("IDIQ") contract. (AR 343.)  The contract was set aside for a SDVOSB.  (AR 339.)  Since the issuance of the RFP, the solicitation has been bedeviled with protests.  Finally, on September 17, 2024, the contracting officer determined that GoldPath's offer represented the best value to the VA and selected GoldPath as the awardee.  (AR 8787-80.)

In October 2024, BWT filed this protest challenging the PSI contract award.  BWT argues that the VA: (1) conducted an improper best-value trade-off analysis; (2) arbitrarily evaluated the successful awardee's proposal; (3) breached the implied duty to consider contract proposals fairly and honestly; and (4) improperly used an OCI waiver to permit award.  (ECF 27 at 26-37.)

The defendant and GoldPath argue that the timing of the VA's OCI-waiver request did not violate the FAR, and that BWT's other arguments amount to nothing more than disagreement with the VA's evaluation of the respective offers.

BWT fails to show that the OCI-waiver request reflects that the contracting officer had preselected GoldPath before conducting the best-value trade-off.  The administrative record otherwise is sufficient to support the VA's determinations and its award decision.  Accordingly, BWT's motion for judgment on the administrative record is denied, and the cross-motions of the defendant and defendant-intervenor for judgment on the administrative record are granted.

I.     **FACTUAL BACKGROUND**

The VHA OCC focuses on improving health care by engaging veterans through telehealth. The program consists of "a connected care technology network" that distributes "virtual healthcare, self-care, and related services" through "[t]elehealth devices, web and mobile medical applications, and online health platforms." (AR 224.) Together, these "technologies expand the operations of VA's nationwide, in-person healthcare network by remotely or virtually connecting Veterans with healthcare professionals." (*Id.*)

Historically, the OCC provided these services through a single contractor under the "Clinical Enterprise Video Network (CEVN) Blanket Purchase Agreement (BPA) (VA119-15-A-0131), awarded in 2015, and the follow-on, single-award OCC Equipment and Services Transition Requirements Contract (36C10G21D0016), [a]warded in 2021." (AR 470.) In 2022, the VA elected to procure the CEVN services through "three distinct and separate contracts to leverage innovation and flexibility to meet mission needs." (AR 226.) These three interrelated contracts are: the PSI contract, the Connected Care Integration Network ("CCIN") contract, and the Connected Care Product Catalog ("CCPC") contract. (AR 257.) Currently, Iron Bow Technologies, LLC ("Iron Bow"), performs the incumbent CEVN contract, with members of the GoldPath joint venture as subcontractors. (AR 6587-88.)

The PSI contract will require the awardee to provide program-support integration through four functional areas: (1) "Program Management and Program Integration Support – Ensur[ing] integrated support across all [functional areas] as well as integration with the technical support provided through the CCIN IDIQ"; (2) "Project, Release, and Implementation Management Support – Provid[ing] overall management of the processes required to engineer, release, and implement new, enhanced, and remediated VA-developed or VA-customized technologies"; (3) "Communications Support – [providing] the necessary activities to raise awareness of unique VA connected care technologies, including coordination with the field and Veteran organizations to prepare for the rollout of new releases and patches to repair technology issues"; (4) "Training Development, Delivery, and Implementation Support – [providing] all services necessary to develop, deliver, and implement new and updated highly specialized, training content targeted towards end-users of VA-developed and VA-customized virtual care technologies, including Veterans and VA health care providers." (AR 470-71.)

On September 15, 2022, the VA issued an RFP for a single award, firm-fixed-price, IDIQ contract for the PSI contract. (AR 343.) The contract is set aside for a SDVOSB. (AR 339.) The performance period is seven years, comprised of a five-year base period and two one-year option periods. (AR 344.)

The performance work statement described the PSI contract as program integration and project management, which "serve as the backbone of the product development and service delivery processes to ensure that the implementation of all VA-built products and services are tightly integrated and carefully coordinated with communications and training activities." (AR 676.) Under the contract, the contractor is required to "provide integrated services and solutions in support of VA connected care technologies." (*Id.*) These technologies are defined as "the combined VA ecosystem of clinical video equipment and software; store and forward technologies; web and mobile health applications; software-as-a-service (SaaS) / platform-as-a-

3

service (PaaS) technologies; commercial-off-the-shelf (COTS) software products; mobile medical devices, peripherals, and wearables; remote patient monitoring technologies; online health portals; future connected care technologies; and ancillary items." (*Id*.) The contractor's responsibilities under the PSI contract also include conducting contract-level program reviews, planned and jointly conducted, with the CCIN contractor. (AR 679.)

### A. OCI Provision

The RFP included a provision noting that the VA anticipated "the probability of conflicts between this [PSI] solicitation and resultant contract and the following two contracts: 1) the [CCIN] contract; and 2) the [CCPC] contract(s)." (AR 416.) To "avoid and/or neutralize any actual or potential conflict(s)," the RFP provided that "it is possible, or perhaps probable, the Government will prohibit the awardee (or subcontractor) of one to be the awardee (or subcontractor) on one or both of the other two contracts." (*Id*.)

This OCI provision required offerors to provide with their offers a statement that described "any past, present, or currently planned interest (financial, contractual, organizational, or otherwise) or actual or potential organizational conflicts of interest relating to the services to be provided under this solicitation." (*Id*.) The provision empowered the contracting officer to "determine that an organizational conflict of interest exists which would warrant disqualifying the Contractor for award of the contract unless the organizational conflict of interest can be mitigated to the Contracting Officer's satisfaction." (AR 417.) Finally, the provision explained that if a conflict of interest that cannot be mitigated existed, but the contracting officer nevertheless determines "that it is in the best interest of the United States to award the contract, the Contracting Officer shall request a waiver [of the OCI] in accordance with FAR 9.503." (*Id*.)

### B. Evaluation

The VA would evaluate offers based on three factors: Technical, Past Performance, and Price. (AR 617-18.) The technical factor consisted of three subfactors: Transition-In Approach, Technical Capability, and Sample Task Order. (*Id*.) The RFP noted that the award would be made to the responsible offeror whose offer would be most advantageous to the government. (AR 435.) The contracting officer would conduct a best-value trade-off analysis under FAR Part 15 to determine the awardee. (AR 436.) The best-value trade-off would allow "the Government to select other than the lowest priced proposal or other than the highest technically rated proposal." (AR 618.) In addition, under FAR Part 15, "[t]he evaluation factors and significant subfactors that apply to an acquisition and their relative importance, are within the broad discretion of agency acquisition officials." FAR 15.304(c).

The VA noted that technical was significantly more important than past performance, and past performance was significantly more important than price. (AR 617-18.) Within the technical factor itself, the subfactors were of equal importance. (*Id*.)

According to the solicitation, the technical factor would be evaluated based on the offerors' understanding of the problem and the feasibility of their approach. (AR 618.) The RFP described an offeror's understanding of the problem as "the extent to which [the proposal] demonstrates a clear understanding of all features involved in solving the problems and meeting

4

and/or exceeding the requirements presented in the solicitation and the extent to which uncertainties are identified and resolutions proposed." (*Id*.) Feasibility of approach would be evaluated based on "the extent to which the proposed approach is workable and the end results achievable. The proposal will be evaluated to determine the level of confidence provided the Government with respect to the Offeror's experience, methods and approach in successfully meeting and/or exceeding the requirements in a timely manner." (*Id*.)

Under the technical factor, offers would be rated as "outstanding," "good," "acceptable," "susceptible to being made acceptable," or "unacceptable." (AR 619-20.) As to past performance, the VA would rate offers as "low risk," "moderate risk," "high risk," or "neutral." (*Id*.) Under the RFP, price would be evaluated for reasonableness, which "may be determined based on pricing information submitted with the Offeror's proposal and by comparison of 1) competitive offers received in response to the solicitation; 2) proposed prices against the Independent Government Cost Estimate (IGCE) and 3) any other price analysis technique authorized in FAR 15.404-1(b). For a price to be reasonable, it must represent a price to the Government that a prudent person would pay in the conduct of competitive business." (AR 348.)

### C. Initial Contract Award

Final offers were due on October 17, 2022. (AR 346.) Nine offerors, including GoldPath and BWT, submitted offers. (AR 2435.) The VA conducted technical evaluations between October and November 2022 and completed its initial source selection evaluation on February 23, 2023. (AR 2213.)

Each offer was evaluated by a Past Performance Evaluation Team ("PPET"), a Technical Evaluation Team ("TET"), and a Price Evaluation Team ("PET"). The proposals were reviewed by the PPET and TET evaluation teams in redacted form, so the evaluation teams did not know the offeror of any proposal it reviewed. (AR 2436.) The PPET reviewed each offer "to conduct an evaluation to determine the extent to which the Offeror[']s performance demonstrates the likelihood of successful performance in providing requirements similar in size, scope, and complexity." (AR 2217.) The TET was "comprised of Subject Matter Experts from the Office of Connected Care," who evaluated each offer to determine whether it met the VA's requirements and whether the offeror was able to perform the contract requirements. (AR 2306.) Finally, the PET "conduct[ed] a price analysis to evaluate price reasonableness and to verify the Offeror's calculation of the total proposed price for all Contract Line Item Numbers (CLINs) for the base period of performance and all option periods together." (AR 2291.) The PPET, TET, and PET then shared their written consensus evaluations with the contracting officer, who served as the source-selection authority ("SSA").

During the technical evaluation, five proposals were rated "unacceptable" and not considered further. Using the evaluations from the consensus reports of the three evaluation committees, the contracting officer, as the SSA, conducted a best-value trade-off of the remaining four proposals. (AR 2491.) The contracting officer recognized that GoldPath offered superior past performance but found that BWT offered a superior technical approach at a significantly lower price and concluded that BWT's proposal offered the best value to the VA. (*Id.*) On March 24, 2023, the VA awarded the PSI contract to BWT. (AR 2522.)

5

**D. Protests and Challenges**

*1. GoldPath's Protest*

On March 31, 2023, GoldPath filed a size protest with the Small Business Administration ("SBA"). GoldPath also filed a protest with the Government Accountability Office ("GAO") on April 5, 2023. (AR 2691, 2702-03.) GoldPath alleged before the GAO that BWT had an unmitigable OCI, and that the VA had unreasonably evaluated BWT's corporate experience, past performance, and price. (AR 2707-10.) In addition, GoldPath alleged that BWT intended to have a subcontractor complete more than half the work under the contract. (AR 2708.) On June 29, 2023, the VA determined that it was "in the best interest of the Government" to take corrective action. (AR 5281-82.) The VA noted that it would "(1) reevaluate the proposals under at least the technical factor; and (2) if necessary, open discussions with a competitive range; and (3) conduct a new trade-off analysis." (*Id.*) On July 6, 2023, the GAO dismissed GoldPath's protest. (AR 5283.)

*2. Revised Proposals*

As part of its corrective action, the VA created a new competitive range with the four offerors, including BWT and GoldPath, whose proposals were rated above "unacceptable." (AR 6710.) The four offerors in the competitive range were invited to submit revised proposals by August 31, 2023. (AR 8767.) On August 14, 2023, the VA sent discussion letters to each of these offerors requesting final proposal revisions and OCI statements. (AR 5291, 5296, 5301, 5306, 5299-300; 5309.) On August 31, 2023, BWT and GoldPath submitted their final proposal revisions. (AR 5855, 6336.)

In its revised proposal, GoldPath reduced its price so that it was less than $1 million more than BWT's revised price. (AR 7453.) The revised proposals were again reviewed by the evaluation teams, which submitted their new evaluations to the contracting officer. Although, the PPET assigned BWT a past-performance rating of moderate risk, the contracting officer determined that BWT's lack of any relevant past-performance examples merited instead a neutral rating. (AR 6803, 7451-52.)

The TET completed its reports of the final proposal revisions on November 6, 2023. (AR 7397.) The TET gave GoldPath's proposal an outstanding rating. (AR 6768.) The contracting officer disagreed and downgraded GoldPath's technical rating from outstanding to good. The contracting officer explained her decision to downgrade GoldPath's technical rating as being the result of:

> a weakness found in [GoldPath's] evaluation, specifically regarding identifying promising innovations and conducting technical assessments[.] [I]t was assessed [that]:
> > "…[GoldPath] described how they will ensure an end user focuses on requirements and usability in the technology scanning environment and cites experience working with a customer to assess and test a virtual scribe platform (Feasibility Demonstration, page 54); however, they have

6

> > not adequately described the technical aspects of the assessments such as how they will coordinate with the OCC lab, coordination of mobile services, and technical integration with existing or new mobile medical applications. . . . The lack of technical discussion increases the risk of unsuccessful contract performance."
>
> > In the initial proposal evaluation, [GoldPath] received a significant weakness for this same subfactor. It is noteworthy that their revised proposal response improved their subfactor rating to a weakness, but it still demonstrates the Offeror did not provide adequate details nor have a full understanding of the problems associated with this subfactor. Their overall revised proposal response, even with the additional strengths and significant strengths is commendable but does not warrant an 'Outstanding' rating. Whereas this subfactor is not more important than others, it is equal in weight of consideration, cannot be overlooked and does not demonstrate an overall outstanding proposal that "contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible."
>
> (AR 7449-50 (second quotation quoting the source-selection evaluation plan's definition of "outstanding," AR 260).)  Aside from this one change to GoldPath's technical rating, the contracting officer agreed with the TET's ratings of the four offerors.

On January 18, 2024, the contracting officer issued a new best-value determination.  She concluded that that the four proposals had the following ratings and prices:[1]

| Offeror | Factor 1 – Technical Rating | Factor 2 – Past Performance Rating | Factor 3 – Price |
|---|---|---|---|
| Offeror C | Good | Low Risk | $222,103,449.66 |
| BWT | Good | Neutral | $255,828,387.73 |
| Offeror D | Good | Low Risk | $236,995,732.35 |
| GoldPath | Good | Low Risk | $256,756,024.74 |

---

[1] As noted, each evaluation team reviewed offers from which the name of the offeror was redacted.  Accordingly, the VA assigned to each offeror a letter, Offeror A, B, C, etc.  The assigned pseudonyms for each offeror at the VA differ from those used in this opinion to refer to the other two final offerors whose proposals were considered.

7

(AR 7453.)

Based on these ratings and proposed prices, the contracting officer concluded that GoldPath's proposal offered the best value to the VA (AR 7480) and awarded the contract to GoldPath on February 26, 2024.  (AR 7481.)

### 3. *BWT's Protests*

On March 4, 2024, BWT filed a size and status protest against GoldPath with the SBA. (AR 7508.)  On March 11, 2024, BWT filed a GAO protest.  (AR 7888.)  BWT alleged that the VA had improperly evaluated past performance, failed to recognize that GoldPath had an unmitigable OCI, and failed to conduct a proper best-value trade-off analysis.  (AR 7909; AR 8222-75.)  BWT also argued that GoldPath lacked relevant performance references and would be reliant on Iron Bow, the current CEVN contractor, for which a member of the GoldPath joint venture serves as a subcontractor, to perform the work.  (AR 8222-75.)

On March 28, 2024, the VA filed a second notice of corrective action, explaining that it would "(1) review evaluations under the past performance and technical factors; (2) if necessary, reevaluate and conduct a new trade-off analysis; and (3) take any other action deemed necessary."  (AR 8612-13.)  The GAO dismissed BWT's protest on April 2, 2024.  (AR 8617.) On April 8, 2024, the SBA stayed the size protest.[2]  (AR 7883.)

### E. Final Evaluation and Award

In May 2024, the VA conducted new technical and new past-performance evaluations. (AR 8791.)  Between the second and third best-value trade-off analyses, the offerors' proposals were not revised, and no discussions were conducted.  (AR 7401; 8794.)  Additionally, over the three sets of proposal evaluations, the composition of the three evaluation teams was essentially unchanged.  (AR 2436; 7401; 8794.)

### 1. *Final Ratings*

Upon reevaluation, the TET again rated GoldPath's technical proposal as "outstanding" and rated BWT's technical proposal as "good."  (AR 8669-88.)  The TET rated GoldPath's technical proposal as follows: one strength for the transition-in approach subfactor; one significant strength, five strengths, and one weakness for the technical capability subfactor; and three significant strengths for the sample task order subfactor.  (AR 8669-88.)  The TET found no significant weaknesses or deficiencies in GoldPath's proposal.  (*Id*.)  The TET rated BWT's technical proposal as follows: no strengths for the transition-in approach subfactor; two significant strengths and three strengths for the technical capability subfactor; and no strengths for the sample task order subfactor.  (AR 8806-15.)  The TET found no weaknesses, significant weaknesses, or deficiencies in BWT's proposal.  (*Id*.)

The PPET rated all four offerors' past performance as "neutral."  (AR 8795, 8806, 8817, 8828, 8842.)  The PPET found that although BWT's references were similar in scope and

---

[2] The size protest by BWT at the SBA remains stayed and pending.  (AR 9239.)

complexity to the solicitation, only one of the four references was similar in size. (AR 8816-17.) As a result, it determined that BWT had no relevant past performance. The PPET also determined that GoldPath did not have relevant past-performance references. (AR 8732.)

### 2. *OCI Investigation*

Because BWT had alleged before the GAO that GoldPath had an unmitigable OCI, the contracting officer conducted an OCI investigation as part of the VA's corrective action. (AR 8739.) On June 14, 2024, the contracting officer noted in a letter to GoldPath concerns about a potential OCI arising from GoldPath's work as a subcontractor for the incumbent CEVN contractor, Iron Bow. (AR 8739.) The letter noted that there may be overlap between GoldPath's work on the incumbent contract and the transition-in period for the PSI contract. (*Id*.) GoldPath was requested to "provide a viable and specifics[-]driven mitigation plan, clarifying its position on identifying potential OCI's" and to articulate what "GoldPath . . . will do to avoid, neutralize and/or mitigate any OCI that may arise, not only during program reviews and implementation studies support, but in any area of PSI support throughout the lifespan of the contract." (AR 8740.)[3]

On July 16, 2024, the contracting officer finalized a memorandum documenting her findings on the alleged OCI. (AR 8741.) The contracting officer concluded that she "did not identify any actual or potential impaired objectivity OCIs." (AR 8750.) She went on to note that "[d]ue to the complexity of this contract, [she] ha[d] concerns that there may be the potential for a currently unidentified impaired objectivity OCI to arise during the transition-in period, as GoldPath and the majority of its proposed subcontractors will continue to support Iron Bow, the prime legacy contractor, while also transitioning in as the PSI contractor." (AR 8755.)

To mitigate this potential OCI, GoldPath proposed a "protocol to utilize a 3rd party, non-incumbent, subcontractor to perform duties where an OCI may arise." (*Id*.) This proposal would "separate[ ] the lanes of responsibility as the 3rd party subcontractor has no involvement in the Iron Bow contract." (*Id*.) Although the contracting officer had determined that GoldPath had proposed "on its face, an acceptable approach," she believed that "the safest option for the Agency is to seek a waiver to dispel any potential OCI concerns during the transition-in period." (*Id*.) The contracting officer concluded that she would therefore "present this OCI analysis to the agency Head of Contracting Activity ("HCA") and request approval to waive any general rule or procedures during the transition-in period, for any OCIs." (AR 8755.)

On July 16, 2024, the contracting officer submitted the OCI-waiver request to the VA's HCA. (AR 8765.) In her justification for the waiver, the contracting officer explained that "[t]he technical factor is significantly more important, therefore, if I were to award to another Offeror, the Government would lose out on multiple technical benefits that would be gained from the outstanding technically rated offeror." (AR 8753.) The reference to "the outstanding technically rated offeror" was to GoldPath.

---

[3] GoldPath's response to the VA's letter was not included in the Administrative Record.

In both her OCI memorandum and the OCI-waiver request, the contracting officer referred to GoldPath as "the apparent awardee of the PSI contract." (AR 8747; 8765.) In her memorandum, the contracting officer noted expressly that "[t]he apparent awardee is GoldPath Communications JV, LLC." (AR 8741.) In the waiver request, she described the award process as being dependent on the OCI waiver, noting that "[i]f [the waiver is] approved, I will move forward with award to GoldPath, if the new trade-off analysis results in them being the best value to the Government." (AR 8755.)

On July 31, 2024, the HCA approved the OCI waiver for GoldPath. (AR 8765.)

3. *Final Review and Award*

On September 17, 2024, the contracting officer completed the third and final trade-off analysis. (AR 8787-880.) In a detailed, 94-page analysis of all four offers and a comparison of GoldPath's offer to each of the other three offers, the contracting officer agreed with the TET's ratings of the offers of both BWT and GoldPath. (AR 8844.) Rather than downgrade GoldPath's technical rating, as she had done during her second review, the contracting officer determined that GoldPath had addressed the significant weakness related to "identifying promising innovations and conducting technical assessments." (*Id*.) Based on that conclusion, she found that her concerns over that aspect of GoldPath's prior proposal had been resolved, and the TET's "outstanding" rating was therefore warranted. (*Id*.) The contracting officer also retained neutral past-performance ratings for all offerors, as the PPET had found. (AR 8845.) The contracting officer's final evaluation ratings were:

| Offeror | Factor 1 – Technical Rating | Factor 2 – Past Performance Rating | Factor 3 – Price |
|---|---|---|---|
| Offeror C | Good | Neutral | $222,103,449.66 |
| BWT | Good | Neutral | $255,828,387.73 |
| Offeror D | Good | Neutral | $236,995,732.35 |
| GoldPath | Outstanding | Neutral | $256,756,024.74 |

(AR 8845.)

The contracting officer then undertook the best-value analysis. In comparing GoldPath's proposal to BWT's, the contracting officer found that when "considering the relative weight of each factor, with the Technical Factor being significantly more important than the Past Performance Factor, which is significantly more important than the Price Factor, it is my opinion that [GoldPath]'s proposal represents the best value when compared with [BWT]'s." (AR 8867.)

The contracting officer's justification for choosing GoldPath explained that:

> [GoldPath] increased their technical rating from 'Good' based on original proposals to 'Outstanding' based on revised proposals, resulting in more significant technical benefits to the Government than those provided by [BWT] in its revised proposal.
>
> [GoldPath]'s proposed technical approaches are technically superior resulting from multiple more significant strengths and strengths when compared to [BWT]'s technical proposal. I fully recognize that [GoldPath] has a weakness in the area of identifying promising innovations and conducting technical assessments.
>
> However, I have confidence in [GoldPath] because the additional and significant technical benefits the Government will obtain from the significant strengths and strengths assessed for [GoldPath]'s technical approach, in my opinion, outweighs the risk associated with [GoldPath]'s weakness.

(*Id.*)

Based on this conclusion, on September 17, 2024, the VA selected GoldPath as the awardee. (AR 8880.)

## II. PROCEDURAL HISTORY

The plaintiff filed this protest on October 11, 2024. (ECF 1.) On December 13, 2024, BWT filed an amended complaint (ECF 26) and moved for judgment on the administrative record. (ECF 27.) The defendant and defendant-intervenor each cross-moved for judgment on the administrative record on January 10, 2025. (ECF 30; ECF 31.) The plaintiff responded on January 24, 2025. (ECF 34.) The defendant and defendant-intervenor replied on February 7, 2025. (ECF 39; ECF 38.) Oral argument was held in Washington, DC on February 18, 2025. At the close of oral argument, the Court announced its decision to deny the protest. This opinion reflects the rationale for that conclusion.

## III. JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The parties do not dispute that the Court of Federal Claims may exercise jurisdiction over this protest, which falls squarely within the court's jurisdiction.

To have standing in a bid protest in this court, a plaintiff must be an "interested party." *Id*. To qualify as an interested party, an offeror must allege facts that, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). The court must determine whether a protester has statutory standing "when the plaintiff is arguing that the contracting officer made an error in evaluating the bid of another contractor." *CACI, Inc.-Federal v. United States,* 67 F.4th 1145, 1152 (Fed. Cir 2023).

In a post-award protest like this one, an offeror can demonstrate a direct economic interest by "show[ing] that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). The "substantial chance" test does not require an offeror to show that, but for the agency's alleged error, it would have been next in line for the contract award, but the offeror must still demonstrate that it had "more than a bare possibility of receiving the award" to have standing. *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).

The parties do not dispute that the plaintiff has standing to pursue this protest. BWT submitted an offer to the solicitation and alleges that it was prejudiced by the VA's arbitrary and capricious evaluation of the proposals. BWT had already been awarded the contract once and stands a reasonable chance of regaining the award if its claims are validated. On this record, BWT has standing to maintain its protest.

### IV.     STANDARD OF REVIEW

All parties have moved for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), which requires the court to make factual findings based on the administrative record. *Bannum, Inc.*, 404 F.3d at 1353-56. Genuine issues of material fact do not preclude judgment. *Id.* Rather, the court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record. *Id.* at 1355; *see also Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018). The plaintiff bears the burden of proving both an error in the award process and prejudice arising from that error. *See Glenn Defense Marine (ASIA) PTE, Ltd. V. United States* 720 F.3d 901, 907 (Fed. Cir 2013); *Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Bid protests alleging that an agency acted arbitrarily and capriciously are evaluated under the Administrative Procedure Act's standard of review. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706). Under that standard, an agency's procurement action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). A court may grant relief only upon the finding that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020).

Upon making that initial determination, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Even if the agency's conduct was arbitrary and capricious or lacked a rational basis, the contract award may not be set aside unless the protester can show it was prejudiced by the conduct. *See Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).

In resolving a bid protest, a court is generally restricted to reviewing the record before the agency at the time it made its decision, not "some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A reviewing court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The "agency's path" in reaching its decision need only "reasonably be discerned" from the record to be upheld. *Id.* at 286.

Under these rubrics, judicial review of a procurement decision in a bid protest is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court might have reached a different conclusion as to the "proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). Even greater deference is afforded to agency decisions when an award is based on best value to the agency. *Glenn Defense Marine,* 720 F.3d at 908; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). A high degree of deference is also due to an agency's evaluations of proposals to a solicitation. *Office Design Group, Inc. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020); *E.W. Bliss Co.,* 77 F.3d at 449 (challenges "deal[ing] with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials" are not subject to "second guess[ing]" by a court).

## V.     DISCUSSION

BWT argues that during the third source-selection decision "all evidence indicates that the contracting officer did a back-of-the-envelope, mechanical determination that GoldPath was the likely awardee," based solely on "the numbers of Strengths and Weaknesses and adjectival ratings weighed against prices." (ECF 34 at 15.) Based on that determination, the plaintiff argues, the contracting officer "had decided that GoldPath would be the awardee months before performing any written comparative weighing of the relative merits of each of the competitive range proposals." (ECF 27 at 26.) As a result of the alleged pre-determination, the plaintiff claims that the contracting officer conducted a perfunctory best-value trade-off analysis that provided a justification for the alleged pre-determined outcome. BWT claims that "there is no evidence [ ] that the SSA ever looked behind the adjectival ratings to determine the best value." (*Id*. at 16-17.) As a result, the award to Gold Path is arbitrary and capricious.

To support its claim that the contracting officer pre-determined that GoldPath would be the awardee, BWT relies on the contracting officer's OCI analysis and OCI-waiver request, completed two months before the September 17, 2024, award decision. (ECF 27 at 22-23.) BWT cites to several instances in the OCI documents in which the contracting officer refers to

13

GoldPath as the "apparent awardee." BWT also cites to the contracting officer's statement that, if the OCI waiver is approved, she "will move forward with award to GoldPath, if the new trade-off analysis results in them being the best value to the Government." (*Id*.) BWT argues that the plain meaning of the term "apparent awardee" and the contracting officer's express intent to award the contract to GoldPath if the OCI waiver were to be approved reflect the contracting officer's premature decision to make the award to GoldPath before conducting the required best-value determination. BWT expressly disclaims any argument of bad faith or improper conduct. Instead, it argues that the contracting officer assumed her conclusion based on a quick consideration of the offerors' adjectival ratings and then headed ineluctably to reach that assumed conclusion. (ECF 34 at 7.)

The plaintiff also claims that the OCI waiver was "the product of a flawed OCI investigation," and as a result its use was "arbitrary, capricious, an abuse of discretion, and contrary to law." (*Id.* at 37.) BWT argues it was improper for the contracting officer to seek a waiver unless it had identified an apparent successful offeror, and because the contracting officer sought the waiver prior to conducting the best-value trade-off, "there should not have been an apparent successful offeror at all." (*Id*. at 38.) Thus, according to the plaintiff, the waiver request failed to meet the requirements of FAR 9.504(e). (*Id*.) BWT also claims that "because that award decision was effectively made before any best-value tradeoff was done" the OCI waiver was not in the best interest of the government. (*Id*. at 39.)

Finally, BWT argues that the contracting officer's pre-determination that GoldPath would be the awardee resulted in an arbitrary and capricious best-value trade-off analysis. Specifically, the plaintiff claims that the contracting officer: (1) failed to properly evaluate the risk of GoldPath's price reductions; (2) failed to justify and document her changed rating for GoldPath's proposal under Factor 1, Technical; (3) engaged in disparate treatment while evaluating BWT's technical capability; and (4) failed to fairly and honestly consider BWT's proposal.

The defendant and defendant-intervenor dispute BWT's analysis that the use of the term "apparent awardee" evinces the contracting officer's pre-determination of GoldPath as the awardee. Further, they argue that the award decision was reasonable and supported by the contracting officer's analysis, and that BWT has failed to overcome the substantial deference and presumption of correctness for contracting decisions.

### A. Pre-determination of GoldPath as the Awardee

The crux of the plaintiff's case is its contention that the contracting officer's OCI review and OCI-waiver request reflected a pre-determination by the contracting officer, prior to her best-value trade-off determination, that GoldPath would be the awardee. This pre-selection of GoldPath, according to BWT, tainted the best-value trade-off analysis and the resulting conclusions of the contracting officer. As a result, BWT claims, the award to GoldPath was arbitrary and capricious.[4] Specifically, BWT argues that the contracting officer's decision to

---

[4] In addition to its argument that the contracting officer's pre-selection of GoldPath was arbitrary and capricious, BWT argued in its briefs that it was illegal for the contracting officer to have conducted the OCI evaluation and requested the waiver prior to conducting the best-value

14

apply for the waiver prior to the best-value trade-off and her repeated use of the term "apparent awardee" in reference to GoldPath demonstrate that the contracting officer had selected GoldPath as the awardee before conducting the best-value analysis. Such pre-selection could only have been based on the offerors' adjectival ratings and would be arbitrary and capricious.

Contrary to BWT's arguments, the record reflects that the timing of the OCI-waiver request and the term "apparent awardee" used in reference to GoldPath were both reasonable.

The contracting officer's decision to seek an OCI waiver prior to conducting the best-value analysis was appropriate. BWT had raised the prospect of an OCI in its GAO protest. In taking corrective action, the VA naturally decided to evaluate BWT's claim of an OCI. The review failed to substantiate the existence of an OCI (AR 8750), but in an abundance of caution and out of a concern that an OCI could arise in the future during the transition to the new PSI contract, the contracting officer decided to seek a waiver to allow the already-delayed procurement to proceed.

Under the FAR, contracting officers are instructed to "avoid creating unnecessary delays" in OCI investigations and to "[i]dentify and evaluate potential [OCIs] as early in the acquisition process as possible." FAR 9.504(d); *see also* FAR 9.504(a)(1).

The VA proceeded in accordance with the dictates of the FAR. BWT raised the possibility of an OCI; the VA promptly evaluated the claim and rejected it, but, in an abundance of caution for a future OCI, sought the waiver. The process here functioned precisely as the FAR directs.

The contracting officer's decision to waive any potential future OCI during the transition was sensible in the context of this procurement. At the time of the OCI waiver, the acquisition was in its second year and the contracting officer was conducting her third evaluation. GoldPath had the highest adjectival ratings of any of the offerors; it was conceivable that GoldPath would again succeed in receiving the award. It was reasonable for the contracting officer to seek the waiver prior to completing the best-value trade-off to avoid the uncertainty of an OCI hanging over the award, especially when BWT had already raised that issue before the GAO.

The primary evidentiary support for BWT's pre-selection argument derives from the contracting officer's use in the OCI report of the term "apparent awardee" to describe GoldPath. The record does not support BWT's contention that, after using the term "apparent awardee" to indicate GoldPath's pre-selection for the eventual contract award, the contracting officer merely papered over a decision made prior to the ultimate best-value trade-off analysis.

At the time the contracting officer began her OCI investigation on June 14, 2024, she had already received an updated technical evaluation from the TET on May 17, 2024, and a new past performance evaluation from the PPET on May 29, 2024. (AR 8791.) The contracting officer thus had several weeks to review these updated evaluations and form a preliminary view that,

---

analysis. At oral argument, BWT clarified that the timing of the OCI evaluation and waiver request did not present a legal issue but rather were relevant factually to support its claim that the contracting officer had pre-selected GoldPath prior to conducting the best-value analysis.

based on these evaluations, GoldPath was the likely awardee, subject, as the contracting officer herself acknowledged, to "the new trade-off analysis resulting in [GoldPath] being the best value to the Government." (AR 8755.)

On this record, the contracting officer's language appears to describe GoldPath's position as the likely awardee *subject to* the trade-off analysis. Even after the OCI memorandum referred to GoldPath as the "apparent awardee," the award of the contract to GoldPath was dependent on the outcome of the trade-off analysis.

BWT argues that sometime between the contracting officer's receipt of the updated TET evaluation and the initiation of the OCI investigation, the contracting officer relied solely on the adjectival ratings to conduct a back-of-the-envelope determination in favor of GoldPath. BWT is correct that the record is devoid of any indication or description of what occurred between the contracting officer's receipt of the updated evaluations and her preparation of the OCI memorandum. All that is required of the VA is documentation of the final source-selection decision. That ultimate decision is documented. BWT abjures any claim of bad faith by the VA. In the absence of an allegation of bad faith, the silence in the record of the contracting officer's thought processes is not fatal to her otherwise well-reasoned and thoroughly explained final source-selection decision based on her best-value trade-off analysis.

The source-selection decision details the contracting officer's best-value trade-off analysis to demonstrate that she did not simply rely on the adjectival ratings to pre-determine GoldPath as the awardee. The contracting officer conducted a detailed best-value trade-off analysis which was documented in a 94-page document. (8787-8880.) That document reflects that the contracting officer did not simply accept the underlying evaluations. For example, the contracting officer raised a question about BWT's technical rating that prompted the TET to revise its technical report. (AR 8791.) This example reflects the contracting officer's thorough examination and careful analysis. The thoroughness of the source-selection decision is not the work of a contracting officer who is simply justifying a pre-determined outcome.

In the context of the record of this procurement, neither the timing of the OCI investigation and waiver request nor the use of the term "apparent awardee" in reference to GoldPath reflects that the VA improperly pre-selected GoldPath as the awardee. Even if the contracting officer relied on the adjectival ratings to describe GoldPath as the "apparent awardee," at that point in time she was not awarding, and had not awarded, the contract to GoldPath. The contract award was made at the conclusion of the contracting officer's third and final best-value trade-off analysis, which is sufficiently thorough to defeat BWT's claim.

### B. Best-value Trade-off and Award to GoldPath

BWT also challenges the substance of the source-selection decision, arguing that the contracting officer 1) failed to account for GoldPath's reduced price and its effect on GoldPath's performance; 2) lacked a justification for failing to reduce GoldPath's "outstanding" technical rating in the third evaluation after reducing it in the second evaluation; and 3) engaged in disparate treatment during the evaluation of BWT's technical capability. To the extent BWT relies on these arguments as further evidence of the contracting officer's pre-selection of GoldPath, the claims are rejected. As noted, the contracting officer's source-selection decision

carefully evaluated each offeror and analyzed the strengths of each offer.  The facts advanced by BWT were weighed and considered in the final decision.  These facts, separately or together, fail to demonstrate that GoldPath was pre-selected for the award before the best-value determination was made.

As to each claim on its own merits, BWT fails to overcome the substantial deference accorded to an agency's evaluation of the offers.  The record provides a reasonable path outlining the contracting officer's analysis.  Further, her determinations are not arbitrary, capricious, or contrary to law.

1. *GoldPath's Reduced Pricing*

BWT claims that the contracting officer did not "properly take into account the risk of GoldPath's drastically reduced proposed price," because she failed to assign a weakness to GoldPath for the decrease in its proposed price following the first corrective action.  (ECF 34 at 17.)  BWT argues that the contracting officer only addressed "the price evaluation, which was only one of reasonableness and balance, but does not address the question of the *risk* of the drastically cut price and how that should figure into the best-value trade-off calculus."  (ECF 38 at 19.) (Emphasis in original.)

The record, however, reflects that the contracting officer did consider and address GoldPath's price reduction.  The contracting officer compared GoldPath's pricing to General Services Administration labor rates and considered historical prices and competitive published price lists.  The contracting officer concluded that GoldPath's "proposed prices [were] fair and reasonable."  (AR 9414-15.)  That conclusion complied with the requirements of the solicitation.

Although BWT denies it, its argument implies that the contracting officer was required to conduct a price-realism analysis.  The solicitation, however, did not require the VA to conduct such an analysis but instead required only that the VA consider whether offers included unbalanced pricing.  The contracting officer considered that issue and "did not identify any . . . and considers the overall risk to the Government is low to medium in making the source selection decision."  (AR 9415.)

2. *GoldPath's "Outstanding" Rating*

During the second round of evaluations, the TET had rated GoldPath's technical proposal as "outstanding," but the contracting officer reduced that rating to "good."  During the third evaluation, the TET again rated GoldPath's technical proposal as "outstanding;" this time, the contracting officer preserved that rating.  BWT argues that the contracting officer's failure to justify and document her decision not to downgrade GoldPath's technical rating from "outstanding" to "good" was arbitrary and capricious because GoldPath's second and third technical proposals were identical.  (ECF 27 at 18, 31.)  BWT also argues that the explanation by the contracting officer supporting her decision not to change the TET's technical rating is insufficient.  (*Id*. at 31.)

The VA's path in reaching its decision need only "reasonably be discerned" to be upheld. *Bowman Transp., Inc.*, 419 U.S. at 286.  As BWT acknowledges, the contracting officer did

17

explain her decision not to downgrade GoldPath's proposal. She noted in the source-selection decision that she "agree[d] with the [TET's] technical rating of 'Outstanding' for [GoldPath]" but considered the rating "a weak outstanding." (AR 8844.) The contracting officer explained that she was not downgrading GoldPath's technical proposal because during the second evaluation "[GoldPath] received a significant weakness" for its ability to identify promising innovations and conduct technical assessments. (AR 8845.) The contracting officer explained that "[i]n the[ ] revised 2023 proposal, [GoldPath] addressed the previously identified significant weakness" but "due to lack of technical discussion, it was still considered a weakness." (*Id*.) Ultimately, the contracting officer concluded that she "agree[d] with th[e TET's] assessment, and [did] not view the single weakness pertaining to 'identifying promising innovations and conducting technical assessments' as reason alone to not consider this offeror's proposal as 'Outstanding'." (*Id*.) This analysis is sufficient to discern her analytical path. To the extent BWT simply disagrees with the contracting officer's rating, that dispute involves the minutiae of the technical-evaluation process and is not subject to judicial second-guessing. *E.W. Bliss Co.*, 77 F.3d at 449.

### 3. *Disparate Treatment of BWT's Proposal*

BWT argues that its proposal was subjected to disparate treatment in the contracting officer's evaluation of its technical capability. To demonstrate disparate treatment, a protestor must demonstrate that the proposals were "'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Grp.*, 951 F.3d at 1372 (*quoting Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). BWT claims that the VA's evaluation of its technical factor "as only Good, rather than Outstanding" was arbitrary and irrational "considering the technically superior aspect" of its proposal. (ECF 27 at 44.) BWT argues that the contracting officer engaged in disparate treatment when assigning strengths because both its proposal and GoldPath's exceeded the requirements for a successful, low-risk transition. (*Id*.) BWT claims that it offered data-driven metrics like those offered by GoldPath, as well as a communications approach indistinguishable from GoldPath's. Despite the congruence between the two proposals, BWT argues that it received no credit for those approaches from the contracting officer even though GoldPath did. (*Id*. at 43.) The plaintiff argues that its revised proposal "should have warranted additional Strengths or Significant Strengths." (*Id.* at 41)

A high degree of deference is due to an agency's evaluations of proposals to a solicitation. *Office Design Group, Inc.*, 951 F.3d at 1373 (holding that a protestor must show the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" before "a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals"). BWT fails to demonstrate its proposal and GoldPath's were indistinguishable, such that the contracting officer's disparate ratings are unsupported and unjustified. For example, GoldPath's proposal indicated that "at least 50% of the required resources will already be onboard to allow them to begin work on Day 1." (AR 867.) BWT's transition plan indicated "complete transfer within [* * *] days of award." (AR 5886.) The same is true for BWT's claims that each offeror's communications strategy and understanding of the OCC's mission were evaluated in a disparate manner, because those aspects of each offer were likewise not identical. Given the differences between the two proposals, BWT cannot

18

succeed in showing that its proposal received disparate treatment in the VA's technical evaluation.

### C. Implied Duty

BWT argues that "the agency has breached the implied duty to consider BWT's proposal fairly and honestly" through "the pre-selection of the awardee before the completion of the best-value trade-off." (ECF 34 at 26.) The plaintiff argues that in combination, its claims demonstrate that the contracting officer did not conduct a fair or rational best-value trade-off and "effectively tilted the competition in favor of Gold[P]ath and removed the best-value trade-off process from the RFP." (*Id*. at 37.) These actions, the plaintiff argues, violated the VA's obligation to conduct business with integrity, fairness, and openness, as required by FAR 1.102(b)(3), and to provide BWT with impartial, fair, or equitable treatment, as required by FAR 1.602-2(b). (*Id*. at 36.)

BWT's argument relies on its claims that have already been rejected. The contracting officer did not pre-select the awardee before completing the best-value trade-off. The VA did not, therefore, violate the duty to consider BWT's proposal fairly and honestly.

Although BWT denies that it is alleging bad faith, its argument on the VA's violation of the duty of fair dealing is essentially an allegation of bad faith. BWT challenges the contracting officer's source-selection decision as simply providing a justification for her pre-selection of GoldPath based solely on the adjectival ratings and not an accurate analysis of the relative strengths and weaknesses of the offers. BWT disavows a claim based on bad faith because, to demonstrate it, BWT would have to overcome the presumption of the VA's good faith with "clear and convincing" evidence. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). The record is devoid of any indication that the VA breached its implied duty of good faith and fair dealing. On this record, BWT was treated fairly, its proposal carefully and thoroughly considered and evaluated. BWT ran a close second, but second it was.

### VI. CONCLUSION

Nothing in the record reflects that the contracting officer improperly pre-determined GoldPath as the awardee or otherwise violated the FAR. Moreover, the contracting officer's analysis provides a reasonable path to her award decision. That decision is not arbitrary, capricious, or contrary to law. Finally, as GoldPath's award was not pre-determined and the administrative record supports the award decision, the VA did not violate its implied duty of good faith and fair dealing. Accordingly, BWT's motion for judgment on the administrative record is denied, and the cross-motions of the defendant and defendant-intervenor for judgment on the administrative record are granted. A separate order directing the entry of judgment will be filed concurrently with this opinion.

s/ Richard A. Hertling<br>
**Richard A. Hertling**<br>
**Judge**